The STATE of Ohio, Appellant,

v.

RENIFF, Appellee.

[Cite as *State v. Reniff*, 146 Ohio App.3d 749, 2001-Ohio-4353.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 78481.

Decided Sept. 24, 2001.

752

William D. Mason, Cuyahoga County Prosecuting Attorney, and Jose Torres–Ramirez, Assistant Prosecuting Attorney, for appellant.

Patrick DiChiro; James Draper, Chief Public Defender, and Robert M. Ingersoll, Assistant Public Defender, for appellee.

ANNE L. KILBANE, Judge.

{¶ 1} This is an appeal from an order of Judge William Coyne that granted appellee Ryan Reniff's motion to suppress evidence discovered in his apartment under a warrant. The appellant state argues that the warrant was based upon evidence that satisfied probable cause or, in the alternative, that the exclusionary rule is inapplicable because the officers had objective, good-faith reliance on the warrant's validity. We disagree and affirm.

{¶ 2} Judge Kenneth Callahan issued a search warrant for 14741 Lorain Avenue, apartment 11, in Cleveland, based upon the affidavit of Cleveland Police Detective Richard Milligan. The search resulted in the arrest of then twenty-one-year-old Reniff and a subsequent indictment for preparation of drugs for sale, drug possession, and possession of criminal tools. He moved to suppress the evidence seized and, at a hearing on that motion, it was stipulated that the content of Detective Milligan's affidavit was the only information supporting issuance of the warrant:

{¶ 3} "Affiant states that information was received, and an investigation conducted, during the past two months that illegal drug sales were occurring out of the above-described apartment and another apartment in the same apartment building, Apt. 1. Apt. 1 is on the southeast corner and on the first floor of the subject apartment building.

{¶ 4} "Specifically, information was received that a John Anderson, 'Jack,' was selling drugs out of Apt. 1. Jack is described as a white male, 5'9", 210 pounds, SS# [* *-* *-* * * *].

{¶ 5} "Investigation has revealed that Jack was arrested in August of 1999 and used the above-described premises, specifically Apt. 1, as his residence.

{¶ 6} "During the course of the investigation, it was learned that 'James' sells drugs out of the subject apartment, Apt. 11 and further provides Jack in Apt. 1 with drugs to sell.

{¶ 7} "Periodic surveillance revealed that James, a white male, 5'9", approximately 180 pounds, was seen entering and exiting Apt. 11. Specifically, James has been seen entering a 1964 Mercury Comet, which is parked in the back of the subject apartment building. A check of that vehicle's registration reveals it is listed to a 'James Reniff.'

{¶ 8} "Affiant states that during the past week, he conducted periodic surveillance of the premises during which persons were observed to either enter the apartment building, enter Apt. 1, stay for a period of less than five (5) minutes, then leave or pull up in a vehicle and be met by a white male fitting the

description of Jack and conduct a hand-to-hand exchange. In affiant's experience this type of pedestrian and vehicular traffic is indicative of drug sales activity.

{¶ 9} "Further surveillance revealed that Jack would exit Apt. 1 and walk up the steps to Apt. 11, and has been seen either entering Apt. 11 or going up to the third floor, and engage in a conversation with another white male fitting the description of James Reniff. The conversations would occur from balcony to balcony, between Jack in Apt. 1 and James in Apt. 11. Continuing surveillance revealed that Jack would then disappear briefly on the third floor, and then return. At times, Jack would either go to a vehicle parked outside of the apartment building, and conduct hand-to-hand exchanges or go directly to his apartment, Apt. 1, whereby drug sales would resume."

{¶ 10} The affidavit further stated that police, through a confidential informant, had executed a "controlled buy" of heroin from apartment 1. The judge granted the motion to suppress, stating:

{¶ 11} "I do not see anything that even remotely rises to the level of probable cause for a search warrant for Apartment 11. Merely having a conversation with this James by Jack certainly would not extend the search warrant into apartment No. 11."

{¶ 12} The state asserts the following assignment of error:

{¶ 13} "The trial court erred when it found that the search of appellee's apartment violated his Fourth Amendment rights."

[1] {¶ 14} The state argues that the warrant was properly issued or, in the alternative, that the police executed the warrant in good-faith reliance on its validity, pursuant to *United States v. Leon*[1] and *State v. Wilmoth.*[2] Although Reniff argues that the state has waived reliance on the good-faith exception, the issue was raised by the state in its brief in opposition to the motion to suppress, and thus sufficiently preserved for review.

■■ {¶ 15} We first address whether the warrant was valid under the standards announced in *Illinois v. Gates.*[3] Although the United States Constitution requires search warrants to issue only upon probable cause, *Gates* requires a reviewing court to defer to an issuing judge's discretion when deciding whether a warrant was validly issued.[4] Thus, even though the existence of probable cause

---

1. (1984), 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677.

2. (1986), 22 Ohio St.3d 251, 22 OBR 427, 490 N.E.2d 1236, paragraph one of the syllabus.

3. (1983), 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527.

4. Id. at 236–37, 103 S.Ct. at 2331, 76 L.Ed.2d at 546–548.

is a legal question to be determined on the historical facts presented,[5] we will uphold the warrant if the issuing judge had a "substantial basis" for believing that probable cause existed.[6]

{¶ 16} In order to show the existence of probable cause, the warrant must be based on evidence showing a "fair probability" that the items sought will be found on the premises.[7] The affidavit here gives no indication that drugs will be found in apartment 11, because it states only that "Jack," the occupant of apartment 1, has been seen conversing with "James," the occupant of apartment 11. The affidavit is equivocal on whether Jack has even been seen entering apartment 11, although even this evidence would be insufficient to raise the suspicion necessary to support a search warrant. The judge correctly concluded that mere conversations or visits between neighbors in an apartment building could not support the search of both apartments when only one of the units was reasonably connected to drug-related activity.[8]

The affidavit asserts nothing more than guilt by association. After making the conclusory allegation that "it was learned that 'James' sells drugs out of the subject apartment, Apt. 11 and further provides Jack in Apt. 1 with drugs to sell[,]" the affidavit totally fails to substantiate the accusation, establishing only that James does appear to reside in apartment 11, owns a car, and is acquainted with Jack, a neighbor in apartment 1.

{¶ 18} Not only does the affidavit fail to establish probable cause for the search of Reniff's apartment, the issuing judge had no substantial basis on which to base a probable cause finding. The term "substantial basis" is as ill-defined as "probable cause" itself but, as discussed *infra*, must require some showing beyond even an "arguable" basis, because even the good-faith exception to the exclusionary rule does not apply absent the arguable existence of probable cause. There was no substantial basis upon which to make a finding because the guilt-by-association allegations were too transparent to satisfy any reasonable formulation of probable cause.[9] The notion of a common-sense understanding of probable cause should encompass not only the reasonable understanding of what

---

5. *Ornelas v. United States* (1996), 517 U.S. 690, 699, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911, 920–921.

6. *Gates,* supra.

7. Id. at 238, 103 S.Ct. at 2332, 76 L.Ed.2d at 548–549.

8. *Sibron v. New York* (1968), 392 U.S. 40, 62, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917, 934; *State v. Fahy* (1988), 49 Ohio App.3d 160, 161–162, 551 N.E.2d 1311, 1313–1314.

9. *Sibron; Fahy.*

inspires suspicion of guilt but the common-sense understanding of the privacy interests protected by the Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution. Issuing a search warrant for an apartment based on nothing more than its occupant's observed acquaintance with a neighbor violates "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." [10] We agree with the trial judge that nothing in the affidavit "even remotely rises to the level of probable cause for a search warrant for Apartment 11."

{¶ 19}  The state next argues that even if the warrant is invalid, the exclusionary rule need not apply to the evidence obtained because the police officers executed the search in good-faith reliance on the warrant's validity.[11] Despite widespread criticism of the good-faith exception to the exclusionary rule,[12] this state has adopted the federal rule, declining to find greater protection under the Ohio Constitution.[13] We review this issue *de novo*, recognizing that the state bears the burden of showing that the good-faith exception is applicable.[14]

{¶ 20}  The good-faith exception is based on the premise that the exclusionary remedy is intended to deter misconduct or carelessness on the part of those who seek warrants, not those who issue them.[15] Not only does the rule apply to ameliorate a warrant's "technical" deficiencies,[16] it has also been held to apply even where the warrant is insufficient to support probable cause.[17] In such cases, the exclusionary rule will not apply in a narrow range where the evidence fails to set forth even a substantial basis upon which to find probable cause, yet is not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." [18]  In other words, in order to apply the exception, we must be able to state that a police officer had an objectively

10.  *Massachusetts v. Upton* (1984), 466 U.S. 727, 732, 104 S.Ct. 2085, 2087, 80 L.Ed.2d 721, 726 (citation omitted).

11.  *Leon,* 468 U.S. at 926, 104 S.Ct. at 3422, 82 L.Ed.2d at 700–701.

12.  See, generally, LaFave, Search and Seizure (3d Ed.1996) 51–102, Section 1.3.

13.  *Wilmoth,* supra.

14.  *State v. Klosterman* (1996), 114 Ohio App.3d 327, 333, 683 N.E.2d 100, 104.

15.  *Leon,* 468 U.S. at 916–919, 104 S.Ct. at 3417–3419, 82 L.Ed.2d at 694–797.

16.  See *Massachusetts v. Sheppard* (1984), 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (warrant failed to describe items to be seized, although affidavit in support did).

17.  *State v. George,* 45 Ohio St.3d 325, 331–332, 544 N.E.2d 640, 646–647.

18.  *Leon,* 468 U.S. at 923, 104 S.Ct. at 3421, 82 L.Ed.2d at 699.

reasonable basis for relying on a warrant that has already failed despite the "great deference" accorded under the *Illinois v. Gates* standard.[19]

{¶ 21} Our discussion of the affidavit in addressing the validity of the warrant, *supra*, also applies here, as the utter lack of any evidence justifying a search of Reniff's apartment prevents any claim of good-faith reliance. When analyzing the "indicia of probable cause" to determine whether police could reasonably rely on a warrant, courts have not allowed police officers to relegate all knowledge of search and seizure standards to the issuing judge or magistrate. The standard of objective good faith posits a reasonably well-trained police officer [20]—it should be no great stretch to surmise that this reasonable officer, while not a legal technician "abreast of each judicial refinement," [21] is nonetheless an official familiar with basic legal rules concerning search and seizure, and is also capable of making practical, common-sense application of known principles to varied fact patterns.[22] The good-faith exception does not allow police to rely blindly upon a judge's issuance of a warrant, but instead requires all law enforcement officials to have some "minimum level of knowledge of the law's requirements." [23]

{¶ 22} In *Leon*, the majority pointed out that the warrant was sought after considerable police investigation, "was supported by much more than a 'bare-bones' affidavit," [24] and the existence of probable cause was a matter of much debate among the judges who reviewed the case below, as the affidavit "provided evidence sufficient to create disagreement among thoughtful and competent judges" [25] on the issue. In fact, critics of the decision have suggested that the facts might have passed muster had the court remanded the case for analysis under the *Gates* test, announced subsequent to the lower court's decision in *Leon*.[26] The *Leon* court, therefore, indicated that reasonable reliance requires

---

19. *Gates*, 462 U.S. at 236, 103 S.Ct. at 2331, 76 L.Ed.2d at 546–547 (citation omitted).

20. *Leon*, 468 U.S. at 922, 104 S.Ct. at 3420, 82 L.Ed.2d at 698, fn. 23.

21. *Gates*, supra.

22. Id.

23. *Klosterman*, supra.

24. *Leon*, 468 U.S. at 926, 104 S.Ct. at 3422, 82 L.Ed.2d at 701.

25. Id.

26. Id. at 959, 104 S.Ct. at 3445, 82 L.Ed.2d at 722 (Brennan, J., dissenting); *LaFave*, supra, at 66–67.

more than merely a colorable or arguable claim, but that the argument in favor of probable cause must have substantial persuasive force.

{¶ 23}   Ohio courts have generally held police officers responsible for knowing not only when the warrant is based on a conclusory "bare-bones" affidavit,[27] but also for knowing whether allegations have sufficient factual basis or require further corroboration,[28] and whether observed facts reasonably lead to an inference of wrongdoing.[29]   The purported basis for searching Reniff's apartment was the observed relationship between "Jack" in apartment 1, who was validly suspected of selling drugs, and "James" in apartment 11, who had been seen conversing with Jack at the apartment building, and possibly allowing Jack inside his apartment.   As already noted, *Sibron*[30] prohibits this sort of guilt by association, and a *Gates* "reasonably well-trained police officer" should be aware of this common-sense application of search and seizure rules.

{¶ 24}   *Sibron* does not state a complex or logically surprising rule—it states only what we hope is the uncontroversial maxim that common-sense definitions of probable cause establish a standard higher than that necessary to spark gossip.   All reasonable government officials should know that more is needed before idle speculation becomes active intrusion.   In these circumstances, the exclusionary remedy is thought to have a deterrent effect on police officers, who are encouraged to learn and consider the basic rules and principles underlying search and seizure protections, and discouraged from presenting inadequate affidavits to judges.

{¶ 25}   While we charitably ignore the dissent's quibbling over who is more sympathetic to members of the judiciary and law enforcement, we do take issue with his conclusion that we misunderstand the good-faith exception and the exclusionary rule.   The dissent, tellingly, stops short of claiming that the affidavit supports probable cause, or even that it provides a substantial basis for such a finding but, instead, submits that one might reasonably rely upon a suspicious fact even though the totality of circumstances inarguably reveals a lack of probable cause.   It relies upon the affidavit's misleading statement that Jack's apparent drug sales "resumed" after he went to the third floor, which affidavit also leads to the conclusion that drug sales "resumed" after visitors entered Jack's apartment and after he encountered people in cars.   The inference that

---

27.   *State v. Rodriguez* (1989), 64 Ohio App.3d 183, 194, 580 N.E.2d 1127, 1135.

28.   *Klosterman,* 114 Ohio App.3d at 334, 683 N.E.2d at 104.

29.   *State v. Jones* (1991), 72 Ohio App.3d 522, 526–527, 595 N.E.2d 485, 488; *State v. McNamee* (2000), 139 Ohio App.3d 875, 882, 745 N.E.2d 1147, 1153.

30.   *Sibron v. New York,* supra.

Reniff supplied drugs to Jack is no more persuasive than the inference that Jack met his supplier(s) during one of the other outlined encounters. The use of the word "resume" in the affidavit is as conclusory as the unsupported statement that the officers "learned" that Reniff was selling drugs—there is no evidence supporting a search of anyone or anything other than apartment 1.

{¶ 26} Even though the *Leon* court stated that a reviewing court need not determine whether probable cause exists before applying the good-faith exception, it also noted that "it frequently will be difficult to determine whether the officers acted reasonably without resolving the Fourth Amendment issue." [31] Therefore, even though it might sometimes be unnecessary to determine the existence of probable cause, it is always necessary to determine whether there is any reasonable argument to support probable cause.

{¶ 27} If one concedes that a glass is empty, one cannot then claim that the ring of milk in the bottom allows another person to have a belief that the glass is full. Similarly, one cannot reasonably rely upon a drop of suspicion when there is no doubt the evidence is insufficient to support a search. For those favored few who go through life in a bell jar, protected from any contact with a transgressor of any degree, the dissent's perfect-world interpretation of the good-faith exception poses no threat. In the real world, however, welcome or unwelcome contact with a "Jack" can be that drop of milk in every empty glass and, for those who lack the dissent's sanctimony, that exception cannot be read or magnified so broadly that a drop becomes objectively reliable indicia [32] of probable cause.

{¶ 28} There is nothing to support even the barely arguable existence of probable cause here, much less to spur serious argument among competent judges. It is unreasonable, both legally and practically, to believe that conversing with one's disreputable neighbor provides probable cause to issue a search warrant. Holding law enforcement officials to a lesser standard would allow them to completely ignore basic privacy interests in the name of objective good faith.

Judgment affirmed.

PATRICIA ANN BLACKMON, P.J., concurs.

TERRENCE O'DONNELL, J., dissents.

---

31. *Leon,* 468 U.S. at 924–925, 104 S.Ct. at 3421–3422, 82 L.Ed.2d at 699–700.

32. "Indicia" is the plural of "indicum"—one cannot have "an (one) indicia."

TERRENCE O'DONNELL, Judge, dissenting.

{¶ 29} I write in dissent to the majority's analysis offered in resolution of this case because it strikes at police officers in this state who, in the course of doing their daily work, seek and obtain search warrants before entering the homes of suspected criminals. My disagreement with the majority opinion is twofold: one, its selective consideration of the facts as presented in Cleveland Police Detective Richard Milligan's affidavit; and two, its misunderstanding of the law regarding the good-faith exception to the exclusionary rule.

{¶ 30} The majority goes into great detail attacking the competence and integrity of the police. In particular, I respectfully disagree with the following statements in the majority opinion:

{¶ 31} "* * * All reasonable government officials should know that more is needed before idle speculation becomes active intrusion. In these circumstances the exclusionary remedy is thought to have a deterrent effect on police officers, who are encouraged to learn and consider the basic rules and principles underlying search and seizure protections, and discouraged from presenting inadequate affidavits to judges.

{¶ 32} "* * *

{¶ 33} "* * * The purported basis for searching Reniff's apartment was the observed relationship between 'Jack' in apartment 1, who was validly suspected of selling drugs, and 'James' in apartment 11, who had been seen conversing with Jack at the apartment building and possibly allowing Jack inside his apartment. As already noted, *Sibron* prohibits this sort of guilt by association, and a 'reasonably well-trained police officer' should be aware of this common-sense application of search and seizure rule."

{¶ 34} In my view, these attacks have no place in a well-reasoned appellate opinion. They are offensive and unnecessary to the analysis of the issues in this case.

{¶ 35} Furthermore, in my view, the majority's version of the facts does not square with Detective Milligan's affidavit, which states in part:

{¶ 36} "During the course of the investigation, it was learned that 'James' [Reniff] sells drugs out of the subject apartment, Apt. 11 and further provides Jack in Apt. 1 with drugs to sell.

{¶ 37} "* * *

{¶ 38} "Further surveillance revealed that Jack would exit Apt. 1 and walk up the steps to Apt. 11, and has been seen either entering Apt. 11 or going up to the third floor, and engage in a conversation with another white male fitting the description of James Reniff. The conversations would occur from balcony to

balcony, between Jack in Apt. 1 and James in Apt. 11. Continuing surveillance revealed that Jack would then disappear briefly on the third floor, and then return. At times, Jack would either go to a vehicle parked outside of the apartment building, and conduct hand-to-hand exchanges or go directly to his apartment, Apt. 1, whereby drug sales would resume."

{¶ 39} My impression is that from their investigation and surveillance, these seasoned and knowledgeable police officers discovered that Reniff sold drugs from Apartment 11 and provided drugs to "Jack" in Apartment 1; that Jack was engaged in illegal drug activity from Apartment 1; and that Jack would walk up to and sometimes enter Apartment 11, engage in balcony-to-balcony conversations with Reniff, and sometimes disappear on the third floor before resuming his drug sales from his apartment or with cars parked outside the building. These activities implicated Reniff and his apartment in Jack's drug activities and provided a reasonable basis to conclude that Reniff and his apartment were directly connected with these drug sales. Viewed jointly, in my view, these observations create an indicia of probable cause.

{¶ 40} I could not disagree more with the majority's analysis of the good-faith exception to the exclusionary rule. The leading case on this topic is *United States v. Leon* (1984), 468 U.S. 897, 898, 104 S.Ct. 3405, 82 L.Ed.2d 677, where the Reporter's syllabus states:

{¶ 41} "(b)* * * [T]he [exclusionary] rule should be modified to permit the introduction of evidence obtained by officers reasonably relying on a warrant issued by a detached and neutral magistrate. Pp. 908–913.

{¶ 42} "* * *

{¶ 43} "(d) Even assuming that the exclusionary rule effectively deters some police misconduct and provides incentives for the law enforcement profession as a whole to conduct itself in accord with the Fourth Amendment, it cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity. In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient. Once the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law, and penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations. Pp. 918–921."

{¶ 44} After holding that a police officer's reliance on a warrant must be "objectively reasonable," *Leon* set forth in paragraph (e) of the Reporter's

syllabus the following four circumstances where suppression remains an appropriate remedy:

{¶ 45} 1. "* * *[I]f the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth,"

{¶ 46} 2. "[I]f the issuing magistrate wholly abandoned his detached and neutral judicial role."

{¶ 47} 3. "Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit *so lacking in indicia* of probable cause as to render official belief in its existence *entirely unreasonable*." (Emphasis added.)

{¶ 48} 4. "Finally, depending on the circumstances of the particular case, a warrant may be so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid."

{¶ 49} The focus here concerns the third category of circumstances that would render the good-faith exception inapplicable, *i.e.*, when it *so lacked in indicia* of probable cause as to render official belief in its existence *entirely unreasonable*. In my view, Milligan's affidavit contains, at a minimum, sufficient *indicia* of probable cause to render law enforcement's belief in the validity of the search warrant entirely reasonable.

{¶ 50} Less showing is necessary to establish an indicia of probable cause than a finding of actual probable cause. An indicia suggests a mere indication that probable cause exists, without rising to the level necessary to support a finding of probable cause. And a probable-cause standard is much less stringent than a preponderance-of-the evidence standard. *United States v. Sokolow* (1989), 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1. As suggested in *Illinois v. Gates*, probable cause requires only *a substantial chance* of criminal activity, not an actual showing of such activity; therefore, otherwise innocent behavior frequently provides a sufficient basis for a showing of probable cause. Probable cause means "*a fair probability* that contraband or evidence of a crime will be found." (Emphasis added.) *Illinois v. Gates*, 462 U.S. at 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 Therefore, by deduction we know that an "indicia of probable cause" can be established by a showing of less than a fair probability, *i.e.*, nothing more than a mere indication of a fair probability.

{¶ 51} Here, based on their belief of the level of heroin activity afoot at the Marquard Apartments in Cleveland, the police made a successful effort to obtain a warrant to search Apartments 1 and 11. After considering the averments

contained in the affidavit to obtain that warrant, the court issued a search warrant, the executing officers relied on it, and recovered the evidence against Reniff in this case. The police executed that warrant in reliance that it had been lawfully issued. In my view, the police in the instant case reasonably relied on it; the majority analysis, I would assert, ignores the difference between the actual existence of probable cause to search and an *indicia* of probable cause to satisfy the good-faith exception to the exclusionary rule.

{¶ 52} The majority opinion implies that Detective Milligan could not have manifested objective good faith in relying on the warrant, because he knew it so lacked in indicia of probable cause and therefore his belief in the existence of probable cause was entirely unreasonable. In other words, the majority asserts that Milligan knew or should have known that he did not have authority to enter Apartment 11. I disagree. After all, Milligan observed Jack selling heroin; he also would observe either a balcony conversation or a visit between Jack and the occupant in Apartment 11 and then he would observe Jack "resume" drug sales. In my view, this demonstrates an indicia of probable cause to support Reniff's involvement and renders Milligan's belief in Reniff's involvement to be reasonable.

{¶ 53} I therefore take strong issue with the majority's characterization of the affidavit as describing only conversations and visits between friends in two apartments. Instead, I believe that the affidavit contains at a minimum an indicia of probable cause of criminal activity and therefore satisfies the good-faith exception in accordance with *Leon.* In my view, the affidavit related the activities of a known drug seller dealing with his supplier, based on the observation and investigation by veteran police officers on the case.

{¶ 54} Finally, the record establishes that Detective Milligan did everything we expect from diligent police officers: he conducted surveillance, arranged a controlled purchase; prepared an affidavit describing his efforts; presented that affidavit to a judge; and obtained authority to execute the search warrant at both Apartments 1 and 11. We need not climb into his psyche to now question the validity of his belief that he had been lawfully authorized to enter Reniff's apartment, search it, and arrest him. There is no doubt in my mind that this officer acted responsibly and reasonably and that his affidavit contains, at a minimum, sufficient indicia of probable cause to render law enforcement's belief in its existence objectively reasonable.

{¶ 55} Even the case authority cited in the majority opinion recognizes the distinction between judicial error and police conduct. For example, in *State v. Wilmoth* (1986), 22 Ohio St.3d 251, 22 OBR 427, 490 N.E.2d 1236, the court cited

*Massachusetts v. Sheppard* (1984), 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737, as follows:

{¶ 56} "In *Sheppard, supra*, the court confirmed the holding in *Leon* and stated [468 U.S. at 990–991, 104 S.Ct. at 3429, 82 L.Ed.2d] at 745:

{¶ 57} "* * * [T]he police conduct in this case clearly was objectively reasonable and largely error-free. An error of constitutional dimensions may have been committed with respect to the issuance of the warrant, but it was the judge, not the police officers, who made the critical mistake. '[T]he exclusionary rule was adopted to deter unlawful searches by police, not to punish the errors of magistrates and judges.' *Illinois v. Gates*, 462 U.S. 213, 263, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (White J., concurring in the judgment). Suppressing evidence because the judge failed to make all the necessary clerical corrections despite his assurances that such changes would be made will not serve the deterrent function that the exclusionary rule was designed to achieve." (Emphasis added; footnote omitted.)

{¶ 58} It appears to me as though the majority is crying over its own spilled milk, decrying the lack of probable cause in this case while admitting that the law does not require the existence of probable cause for the good-faith exception in *Leon* to apply. Scoldingly, the majority refers to "holding law enforcement officials" to a proper standard; however, the whole point of the good-faith exception, as noted above, is not to punish those law enforcement officials who do what is expected of them and who rely on the warrant issued by a magistrate. That is exactly what happened in this case, and what the majority cannot see through its milk-stained glass!

{¶ 59} I would therefore reverse the judgment of the trial court and remand this case for further proceedings. Accordingly, I dissent.